UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

CAVALRY BROKERAGE, INC.,       )
                              )
          Plaintiff,          )
                              )
v.                            )        No.:   3:22-CV-356-TAV-JEM
                              )
ROBERT JONES and              )
RLJ INDUSTRIES,               )
                              )
          Defendants.         )

## MEMORANDUM OPINION AND ORDER

This civil action is before the Court on plaintiff's Motion for Default Judgment [Doc. 33], in which plaintiff moves for a default judgment against defendants pursuant to Federal Rule of Civil Procedure 55(b)(2). The Court has carefully considered the record as well as the relevant law, and for the reasons discussed herein, the Court will **GRANT in part** and **DENY in part** plaintiff's motion [Doc. 33].

## I.    Background

The Court takes as true the factual allegations in the complaint. *Bogard v. Nat'l Credit Consultants*, No. 1:12 CV 2509, 2013 WL 2209154, at *3 (N.D. Ohio May 20, 2013). On January 26, 2020, the company Cavalry Trucking was formed, providing freight hauling and freight brokerage services [Doc. 1 ¶ 8]. Over two years later, Cavalry Trucking separated the freight hauling and freight brokerage sides of its company, transferring the freight brokerage services to plaintiff [*Id.* ¶ 9]. Plaintiff assumed all brokerage contracts and payment requirements from Cavalry Trucking [*Id.* ¶ 22].

Since its founding on July 15, 2022, plaintiff has used the trade name "Cavalry Brokerage" [*Id.* ¶ 33]. Plaintiff has not registered its trade name with the United States Patent and Trademark Office; however, plaintiff has become known within the freight brokerage industry under this trade name, forming working relationships with several customers [*Id.* ¶¶ 35–36]. Additionally, plaintiff submits that it acquired trademarks protections under common law "by their continued use within the State of Tennessee" [*Id.* ¶ 43].

In the business of freight brokerage, plaintiff finds shippers ("Customers") who require products to be delivered via a transportation company ("Carrier") from one location to another [*Id.* ¶ 11]. As a broker, plaintiff organizes the products into shipment loads and receives a fee ("Broker's Fee") [*Id.* ¶ 12]. Once the load is delivered, the Carrier creates an invoice that they send to plaintiff, which plaintiff pays in full using supporting documentation created in the process of organizing the shipment [*Id.* ¶¶ 13–14]. Then, plaintiff creates a Broker's invoice and sends it to the Customer [*Id.* ¶ 14].

To provide these services, a broker must apply for, and receive, a Federal Motor Carrier Safety Administration ("FMCSA") Motor Carrier Number and a United States Department of Transportation Motor Carrier ("MC") Number [*Id.* ¶ 15]. Additionally, a broker must file a Blanket of Coverage form with the FMCSA to designate the broker's agent for service of process [*Id.*]. FMCSA and MC numbers are assigned to, and identify, only one company and are not used for multiple identities [*Id.* ¶ 16]. On or about July 15,

2

2022, plaintiff applied for and received the required FMCSA and MC numbers after the numbers were reassigned due to the transfer from Cavalry Trucking [*Id.* ¶ 17].

On or about May 24, 2022, Robert Jones began working for Cavalry Trucking as an independent contractor, wherein he brokered approximately 35 loads using Cavalry Trucking's FMCSA and MC numbers [*Id.* ¶ 18]. On or about July 5, 2022, Jones decided to cease working for Cavalry Trucking [*Id.* ¶ 19]. Soon thereafter, Jones accessed plaintiff's Google Drive where records were kept, and Jones deleted the Customer bill amounts, which has prevented plaintiff from knowing how much it is able to bill Customers [*Id.* ¶¶ 20–21]. To prevent overcharges, which would tarnish plaintiff's reputation, plaintiff was, and is continuing to, only charge Customers what plaintiff is being invoiced from the Carrier [*Id.* ¶ 21]. This has prevented plaintiff from obtaining any net profit, harming its ability to do business [*Id.* ¶ 23].

On or about July 15, 2022, plaintiff received an email from a Carrier requesting payment and including supporting document [*Id.* ¶ 24]. This supporting documentation indicated that on July 13, 2022, Jones used plaintiff's FMCSA and MC numbers illegally to broker a load from Jones's customer, Jetpack Shipping [*Id.*]. The Proof of Delivery related to the July 15, 2022, request for payment listed "Third Party Freight Charges Bill to: RLJ Industries" but provided no address [*Id.* ¶ 25]. Plaintiff asserts that Jones intended to use plaintiff's FMCSA and MC numbers for the benefit of defendant RLJ Industries [*Id.* ¶ 26].

3

Plaintiff has received invoices for multiple loads that plaintiff alleges were booked by Jones for the benefit of RLJ Industries using plaintiff's FMCSA and MC numbers without plaintiff's authorization [*Id.* ¶ 27]. In essence, plaintiff claims that defendants have falsely passed off their services for those of plaintiff through use plaintiff's FMSCA and MC numbers, as well as plaintiff's name and email addresses [*See id.* ¶ 48]. Plaintiff states it has made repeated demands upon defendants to cease and desist use of plaintiff's FMCSA and MC numbers and plaintiff's trade name [*Id.* at ¶ 28]. While defendants have acknowledged such requests, they have refused, telling plaintiff's counsel, "You do not make demands of me" [*Id.* ¶ 29].

On October 7, 2022, plaintiff filed its complaint against defendants asserting seven claims including violations of the Lanham Act, the Tennessee Trademark Act of 2000, and the Tennessee Consumer Protection Act as well as tortious inference with business relations, tortious interference with contracts, interference with prospective economic advantage, and conversion [*Id.* ¶¶ 31–84]. Plaintiff seeks compensatory damages, punitive damages, and attorney's fees and costs [*Id.* at 13–14]. Additionally, plaintiff seeks (1) defendants' profits, treble damages, and attorney's fees pursuant to 15 U.S.C. § 1117(a); (2) treble damages in accordance with Tennessee Code Annotated § 47-25-514 *et seq.*; and (3) treble damages in accordance with Tennessee Code Annotated § 47-50-109 [*Id.* at 14].

On March 23, 2023, plaintiff applied to the Clerk of Court for an entry of default as to Jones [Doc. 19], and the Clerk entered default on April 17, 2023 [Doc. 20]. On February

4

29, 2024, plaintiff applied to the Clerk of Court for an entry of default as to RLJ Industries [Doc. 24], and the Clerk entered default on March 21, 2024 [Doc. 25]. Plaintiff now seeks a default judgment against both defendants [Doc. 33].

## II.    Analysis

Federal Rule of Civil Procedure 55 "contemplates a two-step process for obtaining a default judgment against a defendant who has failed to plead or otherwise defend." *Banner Life Ins. Co. v. Columbia State Bank*, No. 3:19-CV-119, 2020 WL 3977635, at *1 (E.D. Tenn. July 14, 2020). "First, pursuant to Rule 55(a), a plaintiff must request from the Clerk of Court an entry of default, describing the particulars of the defendant's failure to plead or otherwise defend." *Id.* If the Clerk enters default, "the plaintiff must then move the Court for entry of default judgment pursuant to Rule 55(b)." *Id.*

After the Clerk has entered default, the court must take the complaint's factual allegations as true. *Bogard*, 2013 WL 2209154, at *3; *see also Nat'l Satellite Sports, Inc. v. Mosley Ent., Inc.*, No. 1-CV-74510, 2002 WL 1303039, at *3 (E.D. Mich. May 21, 2002) ("For a default judgement, well-pleaded factual allegations are sufficient to establish a defendant's liability."). However, the court must determine whether the factual allegations "are sufficient to state a claim for relief as to [the] cause of action for which the plaintiff seeks default judgment." *J & J Sports Prods., Inc. v. Rodriguez*, No. 1:08-CV-1350, 2008 WL 5083149, at *1 (N.D. Ohio Nov. 25, 2008); *see also Harrison v. Bailey*, 107 F.3d 870 (6th Cir. 1997) (unpublished table decision) ("Default judgments would not have been proper due to the failure to state a claim against these defendants."). Although the Court

5

takes factual allegations regarding liability as true, the plaintiff must prove the amount of damages. *Bogard*, 2013 WL 2209154, at *3.

Thus, the Court must first consider whether plaintiff has alleged a claim for relief before turning to the issue of the proper remedy.

## A.    Sufficiency of the Complaint

### 1.    Lanham Act – False Designation of Origin

Plaintiff first asserts a violation of the Lanham Act, stating that defendants have, without consent or authorization, used plaintiff's business name, email addresses, and FMCSA and MC[1] numbers in an effort to "intentionally cause confusion and/or to deceive Plaintiff's past, current, and future customers as to the true origin, nature, characteristics, and qualities of services provided under Plaintiff's name" [Doc. 1 ¶¶ 37–38].

This claim rests on 15 U.S.C. § 1125(a)(1)(A),[2] which provides in pertinent part:

> (1)     Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

---

[1]  Plaintiff states "DOT numbers" here, but the Court believes plaintiff is referring to the MC number, as the MC number comes from the United States Department of Transportation [*See* Doc. 1 ¶ 15]. Thus, for consistency purposes, the Court will refer to plaintiff's use of DOT numbers as "MC numbers."

[2]  While plaintiff refers to subsections (A) and (B) of 15 U.S.C. § 1125(a)(1), subsection (B) does not appear to be applicable in this case as plaintiff does not bring allegations relating to commercial advertising or promotion.

6

. . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.[3]

This portion of the Lanham Act "protects against one [] form of unfair competition, known as false designation of origin." *Anthony Vince Nail Spa, Inc. v. M. Vince Nail Spa, L.L.C. (Anthony Vince)*, No. 3:21-CV-366, 2021 WL 5140849, at *3 (M.D. Tenn. Nov. 4, 2021).

To establish a claim for false designation of origin, a plaintiff must show a "likelihood of confusion." *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1123 (6th Cir. 1996). "Courts typically consider various factors in determining a likelihood of confusion, including: (1) 'the relatedness of the services or goods offered by plaintiff and defendant'; (2) 'the similarity between the marks'; and (3) 'likelihood of expansion of the product lines using the marks.'" *Anthony Vince*, 2021 WL 5140849, at *3 (quoting *Johnson v. Jones*, 149 F.3d 494, 502–03 (6th Cir. 1998)).[4]

---

[3] "Use in commerce" means the use of a mark in the ordinary course of trade. 15 U.S.C. § 1127. Specifically, for services, it means when a mark "is used or displayed in the sale or advertising of services and the services are rendered in commerce . . . ." *Id.* Defendants used plaintiff's name in the sale of services as evidenced by plaintiff's receipt of invoices from defendants' customers, and third parties believing that they were receiving services from plaintiff when, in fact, they were receiving services from defendants [*See* Doc. 1 ¶¶ 48–49].

[4] Notably, as plaintiff admits its trade name is not registered, the Court notes that registration of a mark is not mandatory to invoke the Lanham Act. *Iancu v. Brunetti*, 588 U.S. 388, 391 (2019) (citing *Matal v. Tam*, 582 U.S. 218, 225–26 (2017)). "[T]he owner of even an unregistered trademark can 'use [the mark] in commerce and enforce it against infringers.'" *Jack Daniel's Props., Inc. v. VIP Prods., LLC*, 599 U.S. 140, 147 (2023) (quoting *Iancu*, 588 U.S. at 391)). "The use of [unregistered] marks . . . is protected 'if followed by continuous commercial utilization.'" *Bill Collection, LLC v. Latham Cos.*, 82 F.4th 499, 506 (quoting *Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 358 (6th Cir. 1998)). Here, plaintiff alleges it acquired trademark protections by "their continued use within the State of Tennessee[,]" and

7

Here, based on the allegations in the complaint, which the Court must accept as true, defendants are liable for false designation of origin under the Lanham Act. Plaintiff and defendants offer identical services, freight brokerage [Doc. 1 ¶ 48 ("Defendants falsely passed off their services as those Plaintiff")]. Defendant have used plaintiff's exact name, as well as plaintiff's motor carrier numbers [*Id.* ¶¶ 27, 28]. *See Johnson*, 149 F.3d at 503. As to expansion, plaintiff indicates that it "intended to increase its market share within the brokerage industry through the building of new business relationships and increasing the value of [its] current business relationships" [*Id.* ¶ 72].

Accordingly, plaintiff is entitled to default judgment for false designation of origin in violation of 15 U.S.C. § 1125. *See Johnson*, 149 F.3d at 503 ("[T]he defendant has taken the plaintiff's product and has represented it to be his own work. It is difficult to imagine how a designation of origin of a product could be more false, or could be more likely to cause confusion or mistake as to the actual origin of the product.").

### 2.    Tennessee Trademark Act of 2000 (the "Trademark Act")

Plaintiff's second claim comes under the Trademark Act, which plaintiff avers "serves to prevent[] the unauthorized use, reproduction, or imitation of a mark, both those registered and acquired by common law" [Doc. 1 ¶¶ 41–42]. Plaintiff contends it acquired trademark protections under common law by their continued use within Tennessee, and defendant "intentionally sought to violate such protections by their use, reproduction, and

---

further, that it has "become known within the freight brokerage industry under this trade name . . . and within the wider 'Cavalry' family" [Doc. 1 ¶¶ 35, 43].

imitation of [p]laintiff's trade name, which has caused actual and substantial confusion, mistake, and deception as to the origin of services" [*Id.* ¶¶ 43–44].

The Court notes that the Trademark Act "is intended to create a state registration framework and trademark protection that is 'substantially consistent with the' Lanham Act, 15 U.S.C. § 1051 *et seq.*, which provides federal trademark protection." *Kremer v. Reddit, Inc.*, No. 2:21-CV-38, 2022 WL 3702092, at *8 (M.D. Tenn. Aug. 26, 2022), *report and recommendation adopted*, No. 2:21-CV-38, 2022 WL 4241273 (M.D. Tenn. Sept. 14, 2022) (quoting Tenn. Code Ann. § 47-25-518). "To that end, the construction given the federal act should be persuasive authority for interpreting and construing" the Trademark Act. Tenn. Code Ann. § 47-25-518. Accordingly, "courts have applied the Lanham Act standards when evaluating Trademark Act claims." *Kremer*, 2022 WL 3702092, at *8 (citations omitted).

Accordingly, as the Court has already evaluated plaintiff's false designation of origin claim under the Lanham Act *supra*, it finds no need to repeat such analysis here under the Trademark Act. As such, plaintiff is entitled to default judgment for violation of the Trademark Act as well.

### 3. Tennessee Consumer Protections Act ("TCPA")

Next, plaintiff asserts a violation of the TCPA. As discussed previously, plaintiff submits that defendants "falsely passed off their services as those of [p]laintiff" and "held themselves out to be [p]laintiff" [Doc. 1 ¶ 48]. Plaintiff argues that defendants' actions

9

created "actual confusion and/or misunderstanding as to the source of services rendered" [*Id.* ¶ 49; *see id.* ¶¶ 50–51].

"The TCPA forbids deceptive trade practices, including: 'falsely passing off goods or services as those of another'; or 'causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services . . . .'" *Anthony Vince*, 2021 WL5140849, at *5 (citing Tenn. Code Ann. § 47-18-104(b)(1)–(2)). For a plaintiff to establish a claim under the TCPA, he must prove "(1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that the defendant's conduct caused an 'ascertainable loss of money or property, real, personal, or mixed, or any other article or commodity, or thing of value where situated . . . .'" *Roopchan v. ADT Sec. Sys.*, 781 F. Supp. 2d 636, 656 (E.D. Tenn. 2011) (quoting *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005)); *accord* Tenn. Code Ann. § 47-18-109(a). "An act is deceptive where it involves a material misrepresentation, practice or omission likely to mislead a reasonable customer." *Anthony Vince*, 2021 WL5140849, at *5 (internal quotation marks omitted) (quoting *Roopchan*, 781 F. Supp. 2d at 656).

Based on the allegations set forth in the complaint, plaintiff has established the requisite elements for a deceptive trade practices claim under the TCPA. By defaulting, defendants admit that their use of plaintiff's trade name, FMSCA and MC numbers, and email addresses "falsely pass[es]" off plaintiff's services as their own and is likely to cause "confusion as to the source" of those services [Doc. 1 ¶ 48]. Tenn. Code. Ann.

10

§ 47-18-104(b)(1)–(2). Further, defendants' conduct has caused an ascertainable loss of money, as "[p]laintiff has received numerous invoices from various Carriers, which [p]laintiff has paid" but has been unable to seek reimbursement from the Customers given a lack of corresponding information [*Id.* ¶¶ 24, 27, 80]. And defendants admit they have appropriated the funds from the Customers that "should have reimbursed [p]laintiff" [*Id.* ¶ 81]. Accordingly, the Court finds that plaintiff is entitled to default judgment for deceptive trade practices in violation of the TCPA.

### 4. Tortious Interference with Business Relations

To state a claim for tortious inference with business relations, a plaintiff must show:

(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference.

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (internal citations omitted).

Throughout the complaint, plaintiff describes its existing business relationships with Carriers and Customers and prospective business relations with third parties within the brokerage, shipping, and freight industry [Doc. 1 ¶¶ 22, 55, 72]. Defendants, at least, had knowledge of the existing business relationships plaintiff had as Jones, by defaulting, admits that he accessed plaintiff's business records and "deleted [] Customer bill amounts" [*Id.* ¶ 20]. Defendants admit they interfered with these relationships with the intent to cause

11

the breach or termination of these relationships [*Id.* ¶ 56]. Specifically, as alleged by plaintiff, defendants used plaintiff's trade name and FMSCA and MC numbers and held themselves out as being "a saleperson, agent and/or representative of [p]laintiff" during which defendants "misrepresented [p]laintiff within the freight brokerage industry" [*Id.* ¶¶ 58, 75]. Defendants' means and motive were improper, as they used plaintiff's trade name without authorization, as discussed previously, and after ones ceased to work with plaintiff, defendants nonetheless held themselves out as representatives of plaintiffs [*Id.* ¶¶ 19, 58]. Plaintiff's economic relationships with its Carriers and Customers carried economic benefit, and the probability of future economic benefit, particularly in the reimbursement plaintiff received from Customers for its services [*Id.* ¶ 12, 14; *see id.* ¶ 22]. Therefore, the Court finds that plaintiff has established tortious interference with business relationships, entitling it to relief default judgment on this claim.

### 5. Tortious Interference with Contracts

Plaintiff next brings a claim of tortious interference with contracts [Doc. 1 ¶¶ 59–68]. Tennessee Code Annotated § 47-50-109 creates a cause of action for inducement of breach of contract. "In Tennessee, the common law action for tortious interference with contract and the statutory action for unlawful procurement of breach of contract, *see* Tenn. Code Ann. § 47-50-109, have the same elements and operate as alternative theories of recovery." *Hauck Mfg. Co. v. Astec Indus., Inc.*, 376 F. Supp. 2d 808, 832 (E.D. Tenn. 2005) (citation omitted). To succeed under a statutory or common law claim of tortious interference with contract:

12

> (1) there must be a legal contract; (2) the wrongdoer must have knowledge of the existence of the contract; (3) there must be an intention to induce its breach; (4) the wrongdoer must have acted maliciously; (5) there must be a breach of the contract; (6) the act complained of must be the proximate cause of the breach of the contract; and (7) there must have been damages resulting from the breach of the contract."

*Buddy Lee Attractions, Inc. v. William Morris Agency, Inc.*, 13 S.W.3d 343, 359 (Tenn. Ct. App. 1999) (citation omitted*)*; *accord Green v. Champs-Elysees, Inc.*, No. M201200082COAR3CV, 2013 WL 10481171, at *7 (Tenn. Ct. App. Sept. 11, 2013) (citation omitted). "A complaint for tortious interference with contract must do more than simply parrot the legal elements of the cause of action[,]" meaning it must allege "specific facts that, if true, would support each of the seven elements of the tort." *Lee v. State Volunteer Mut. Ins. Co., Inc.*, No. E200203127COAR3CV, 2005 WL 123492, at *10 (Tenn. Ct. App. Jan. 21, 2005).

After reviewing the complaint, the Court finds that plaintiff provides only a "[t]hreadbare recital" of the second element of a tortious interference with contracts claim, which does not suffice to state a claim upon which relief can be granted. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *accord Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555) (stating that a complaint must contain more than "a formulaic recitation of the elements of a cause of action"). "The court should deny a motion for default judgment when the complaint fails to state a claim upon which relief can be granted." *Pinnacle Bank v. Am. Gen. Life Ins. Pol'y*, No. 3:24-CV-305, 2024 WL 3656179, at *1 (M.D. Tenn. Aug. 5, 2024) (citation omitted). Here, plaintiff merely states

13

that it assumed all brokerage contracts from Cavalry Trucking, and that defendants "knew of the existence of such contracts between [p]laintiff and third parties" [Doc. 1 ¶¶ 22, 62]. While plaintiff pleads facts that demonstrate defendants' knowledge of business relationships plaintiff had with third parties, the complaint does not contain sufficient factual matter that defendants had knowledge of any contracts. *See Iqbal,* 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Accordingly, the Court does not find that plaintiff is entitled to default judgment on this claim of tortious interference with contracts.

## 6. Interference with Prospective Economic Advantage

Plaintiff contends that Tennessee courts have "recognized as a cause of action the tortious inference with prospective economic advantage," citing to *Price & Price Mech. v. Hale*, No. 03A01-9612-CH-00402, 1997 WL 367453 (Tenn. Ct. App. July 2, 1997) (*Price*) [Doc. 1 ¶ 70]. In *Mac'Kie v. Wal-Mart Stores, Inc.*, 127 F.3d 1102, 1997 WL 668950, at *7 (6th Cir. 1997) (unpublished table decision), the Sixth Circuit noted there was "considerable doubt" as to whether the State of Tennessee "actually recognize[d]" the tort of interference with prospective economic damage. After considering several Tennessee appellate court cases, the Sixth Circuit determined that *Kultura, Inc. v. S. Leasing Corp.*, 923 S.W.2d 536 (Tenn. 1996) foreclosed relief under the tort of interference with prospective economic damage, disagreeing with the *Price* court's conclusion that the issue was left open in *Kultura* and that "the Supreme Court would . . . recognize the tort. *Mac'Kie*, 1997 WL 668950, at *7–8. Other district courts in this Circuit have proceeded in line with this determination or in similar fashions. *See Tom James Co. v. Rich*, No. 3:24-

14

CV-1310, 2025 WL 1908058, at *2 n.3 (M.D. Tenn. July 10, 2025) (citation omitted); *see also Gammons v. Adroit Med. Sys., Inc.*, No. 3:21-CV-173, 2023 WL 2700704, at *12 n.7 (E.D. Tenn. Mar. 29, 2023), *aff'd*, 91 F.4th 820 (6th Cir. 2024).

Given all this, this Court will follow the lead of other district courts in this Circuit, addressing a claim for interference with business relations instead of, or as if it were, a claim for interference with prospective economic advantage. *See Tom James Co.*, 2025 WL 1908058, at *2 n.3; *Gammons*, 2023 WL 2700704, at *12 n.7. Accordingly, the Court adopts here its analysis of plaintiff's claim for interference with business relations as set out *supra*.

### 7. Conversion

Finally, plaintiff brings a claim of conversion, stating, as previously iterated, that plaintiff received numerous invoices from various Carriers, which it paid, but it was unable to seek reimbursement from the Customer due to a lack of corresponding information [Doc. ¶ 80]. Plaintiff alleges that defendants appropriated the funds from the Customer that should have been reimbursed to it [*Id.* ¶ 81]. Specifically, defendants provided plaintiff's billing information to Carriers to burden plaintiff with the brokerage cost, and then defendants turned around as if they were plaintiff and sent invoices to Customers, "thus allowing them to be paid for the brokerage by the Customer" [*Id.* ¶¶ 82–83].

"[T]he party seeking to make out a *prima facie* case of conversion must prove: (1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, and (3) in defiance of the owner's true

15

rights." *Commc'ns Unlimited Contracting Servs., Inc. v. Comdata, Inc.*, 611 F. Supp. 3d 483, 497 (M.D. Tenn. 2020) (citing *PNC Multifamily Cap. Inst. Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012)). "A cause of action for conversion occurs when the alleged wrongdoer exercises dominion over the funds in '*defiance of the owner's rights.*'" *Ralston v. Hobbs*, 306 S.W.3d 213, 221 (Tenn. Ct. App. 2009) (quoting *Hanna v. Sheflin*, 275 S.W.3d 423, 427 (Tenn. Ct. App. 2008)) (emphasis in original).

Based on the above allegations, the Court finds that defendants appropriated reimbursements that were due and owing to plaintiff for paying brokerage costs. Further, defendants intentionally exercised dominion over these reimbursements by impersonating plaintiff to induce the payment of such reimbursement from the relevant Customers. Lastly, defendants did this in defiance of plaintiff's true rights as evidenced by Jones's prior employment with plaintiff, indicating a knowledge of the freight brokerage payment process, and by defendants informing plaintiff that plaintiff's counsel was not to make demands of them [*Id.* ¶¶ 18–19, 29]. Therefore, plaintiff is entitled to default judgment for conversion.[5]

---

[5] The Court notes that along with the sufficiency of the complaint and the merits of the claims, it has also considered the prejudice to plaintiff if default is not granted, the amount of money at stake, possible disputed material facts, default due to excusable neglect, and the preference for decisions on the merits. *See Russell v. City of Farmington Hills*, 34 F. App'x 196, 198 (6th Cir. 2002) (citation omitted). These factors, in total, weigh in favor of default judgment, particularly considering the length of time since this action has been initiated, the lack of defendants' participation in this case, the lack of evidence of excusable neglect, and the likelihood that a trial on the merits of this case is not attainable.

16

## B.    Damages, Attorney's Fees, and Costs

Plaintiff seeks damages, attorneys' fees, and costs.  Although the Court must take as true the factual allegations regarding liability in the complaint, plaintiff must prove the appropriate amount of damages.  *Bogard v. Nat'l Credit Consultants*, No. 1:12 CV 2509, 2013 WL 2209154, at *3 (N.D. Ohio May 20, 2013).  In determining damages, "[t]he Court may rely on affidavits [and other materials] submitted by plaintiff . . . without the need for a hearing."  *Dirs. of the Ohio Conf. of Plasterers & Cement Masons Combined Funds, Inc. v. Akron Insulation & Supply, Inc.*, No. 5:16-CV-1674, 2018 WL 2129613, at *5 (N.D. Ohio May 8, 2018).  Thus, the Court will consider plaintiff's submitted Affidavit of Daniel Brown, the owner of Cavalry Brokerage, Inc. [Doc. 31].

### 1.    Damages

Plaintiff seeks compensatory damages of $261,775, requesting these damages be trebled pursuant to 15 U.S.C § 1117(a), Tennessee Code Annotated § 47-25-514, and/or Tennessee Code Annotated § 47-50-109 [Doc. 33, p. 1].[6]  In support of this request, and as stated above, plaintiff submits an affidavit from Daniel Brown, the owner of Cavalry Brokerage, Inc., who states he has "been involved in the normal billing and accounts receivable throughout the tenure of [his] ownership" [Doc. 31, p. 1].  The affidavit provides the following damages calculations:

---

[6] The Court notes that given its determination *supra* regarding plaintiff's claim for tortious interference with contracts, the Court will not consider plaintiff's request for treble damages pursuant to Tennessee Code Annotated § 47-50-109.

| | |
|---|---|
| Comparative Loss of Daily Income | $98,360 |
| Unpaid Invoices | $8,000 |
| Credit Card Bills | $1,500 |
| Accountant's Extra Fees | $12,500 |
| Lost Profit | $93,015 |
| Stolen Fees | $14,200 |
| Administrative Assistant's Extra Time | $34,200 |
| **Total** | $261,775 |

[*Id.*].

      Brown provides the basis or calculation for each of these categories of damages [*Id.* at 1–2]. "Comparative Loss of Daily Income" is based on the change in average 30-day daily income for the periods before and after Jones worked for plaintiff, multiplied by 40, *i.e.*, the number of days Jones was employed [*Id.*]. The "Unpaid Invoices" are "directly attributable to companies who refused to pay outstanding invoices based on slanderous communications from Jones to said companies" [*Id.* at 2]. The "Credit Card Bills" are based on Jones's improper use of plaintiff's company credit card [*Id.*]. The "Accountant's Extra Fees" are for the "accountant's time spen[t] in calculating what funds were missing and from where" [*Id.*]. "Lost Profit" is based on Brown's calculation "of running an average of $351 per day for 265 days, which is the length of time we can directly attribute to Jones'[s] actions" [*Id.*]. "Stolen Fees" refers to the fees that Jones "booked using

18

[plaintiff's] credentials . . . wherein the customer believed they were paying [plaintiff] but instead were paying" defendants [*Id.*]. Finally, "Administrative Assistant's Extra Time" is "attributable to dealing with customers who were not paid, invoices which were not paid, and reconciling this information with the accountant" in an attempt to disentangle defendants' actions [*Id.*]

### i. Lanham Act, Trademark Act, and TCPA[7]

The Lanham Act, 15 U.S.C. § 1117(a), states that plaintiffs "shall be entitled . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." If the court finds that the amount of recovery from profits is inadequate or excessive, "the court may in its discretion enter judgment for such sum as the court shall find to be just." 15 U.S.C. § 1117(a). This discretion includes the possibility of awarding "any sum above the amount found as actual damages, not exceeding three times such amount." *Id.* Under the TCPA, the plaintiff is entitled to actual damages, and the court may award treble damages. Tenn. Code Ann. § 47-18-109(a).

When plaintiff seeks lost profit from defendants, "it is not the plaintiff's burden to prove the [defendants'] profits with exactness." *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 605 (6th Cir. 1991). Rather, the plaintiff "need only show that its damages

---

[7] Given plaintiff requests that all his compensatory damages be trebled pursuant to 15 U.S.C. § 1117(a) and Tennessee Code Annotated § 47-25-514, the Court finds it appropriate to address damages under the Lanham Act and Trademark Act, as well as the TCPA which allows the award of treble damages.

19

calculation is a fair and reasonable approximation of its lost profits." *Breeze Smoke LLC v. Speed Wholesale, Inc.*, No. 2:25-CV-10184, 2025 WL 2269785, at *11 (E.D. Mich. Aug. 8, 2025) (citation omitted).

Based on the information provided in plaintiff's default judgment motion [Doc. 33], and its submitted affidavit [Doc. 31], plaintiff has not shown that its suggested figure for "Lost Profit" is a "fair and reasonable approximation." *Breeze Smoke LLC*, 2025 WL 2269785, at *11. Specifically, Brown states that he reaches the amount of $93,015 by "running an average of $351 per day for 265 days," the length of time attributable to defendant Jones's actions [Doc. 33, p. 2]. It is unclear to the Court how Brown reached the $351 per day average in his calculation, and thus, the Court can only speculate that the end result of the calculation is a "fair and reasonable approximation of [plaintiff's] lost profits." *Id.* (noting that the plaintiff's estimate of lost profit was supported, in part, by claims of how many units of the "Infringing Products" were approximately sold and how much profit margin each unit generated); *accord Systematic Power Solutions, LLC v. Fullriver Battery Manufacture Co., LTD.*, No. 3:19-CV-277, 2023 WL 6518861, at *17 (E.D. Tenn. Aug. 18, 2023), *report and recommendation adopted*, No. 3:19-CV-277, 2023 WL 5938187 (E.D. Tenn. Sept. 12, 2023). Therefore, plaintiff's request for lost profits is denied without prejudice at this time.

As to the remainder of plaintiff's categories of damages, the Court finds these suffer from the same issue as plaintiff's category of "Lost Profit," that is, the Court is unable to find that they are reasonable based on the information provided by plaintiff. For

example, Brown's calculation of loss of daily income, under "Comparative Loss of Daily Income," would cause the Court to speculate as to its reasonableness as Brown does not provide the specific amounts for the "30-day daily income" before and after defendant Jones was employed with plaintiff [*See* Doc. 31, pp. 1–2]. Moreover, plaintiff requests over $30,000 for "Administrative Assistant's Extra Time" and over $10,000 for "Accountant's Extra Fees" with no details as to the amount of time spent by either of these individuals or, specifically as to the Administrative Assistant, the hourly wage of such person [*Id.*]. Accordingly, the Court will deny without prejudice plaintiff's request for damages at this juncture and order plaintiff to renew its motion for damages with supporting documentation *infra*.

### 2. Attorney's Fees

Plaintiff has requested $7,311.00 in attorney's fees [Doc. 33, p. 1].[8] In determining whether the requested amount of attorney's fees is reasonable, courts often employ the "lodestar method" which is "the proven number of hours reasonably expended on the case by the attorney, multiplied by a reasonable hourly rate." *Isabel v. City of Memphis*, 404 F.3d 404, 415 (6th Cir. 2005). Twelve factors are considered in determining the reasonableness of hours and the rate:

> (1) time and labor required; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time and limitations imposed by the client or the circumstances; (8) the amount

---

[8] For the reasons stated *infra*, the Court finds it unnecessary at this juncture to determine if plaintiff should be awarded with attorney's fees pursuant to the Lanham Act.

21

involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in "similar cases."

*Id.* at 415–16. However, the most critical factor in determining the reasonableness of a fee award is the degree of success obtained. *Id.* at 416 (quoting *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)).

In determining the appropriate hourly rate to apply, courts "must consider the prevailing market rate in the relevant community for the same type of work at issue." *Brooks v. Invista*, No. 1:05-CV-328, 2008 WL 304893, at *3 (E.D. Tenn. Jan. 30, 2008) (citations omitted). For fee purposes, the "relevant community" is the "legal community within the court's territorial jurisdiction or venue." *Id.* (citations omitted). The "prevailing market rate" is "that rate which lawyers of comparable skill and experience can reasonably expect to command within the relevant community" *Id.* (citations omitted).

As stated above, plaintiff has requested $7,311.00 in attorney's fees [Doc. 33, p. 1]. However, plaintiff has not provided the Court with any documentation in support of this figure. "The key requirement for an award of attorney fees is '[t]hat the documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation.'" *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 553 (6th Cir. 2008) (citation omitted). Without such documentation, the Court cannot give a clear explanation for its award calculation as

22

required. *Moore v. Freeman*, 355 F.3d 558, 566 (6th Cir. 2004) (citation omitted). Accordingly, plaintiff's request for attorney's fees is denied without prejudice.

### 3. Costs

Plaintiff seeks $1,350.07 in costs, but as with its request for attorney's fees, plaintiff provides no evidence for the Court to ascertain the amount of said costs. Accordingly, plaintiff's request for costs is denied without prejudice. *See ProAmpac Holdings, Inc. v. First Source, LLC*, No. 1:20-cv-417, 2021 WL 2334288, at *2 (S.D. Ohio June 8, 2021) (denying plaintiff's request for "costs" in part because plaintiff provided no evidence for the court to ascertain the amount of said "costs"); *Powerhouse Licensing, LLC v. Elite Fitness*, No. 07-14596, 2008 WL 4792641, at *3 n.2 (E.D. Mich. Oct. 28, 2008) (noting its initial refusal to award the plaintiffs attorney's fees and costs as they "did not provide billing records or other proof to substantiate their requests").

## III. Conclusion

For the foregoing reasons, plaintiff's motion [Doc. 33] is **GRANTED in part** and **DENIED in part.** Plaintiff's request for damages is **DENIED without prejudice** with leave to refile. Specifically, plaintiff is **ORDERED** to renew its motion for damages, attorney's fees, and costs, with appropriate, supporting documentation within **thirty (30) days** of entry of this Memorandum Opinion and Order. No judgment will enter at this time.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

23